## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **JUSTIN BUCHLER** | ) | **CASE NO.:** |
| 3745 Berkley Road | ) | |
| Cleveland Heights, Ohio 44118 | ) | **JUDGE:** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT FOR SEX** |
| | ) | **DISCRIMINATION, DISABILITY** |
| **CASE WESTERN RESERVE** | ) | **DISCRIMINATION AND** |
| **UNIVERSITY** | ) | **RETALIATION** |
| c/o Elizabeth J. Keefer | ) | |
| Registrant | ) | |
| 10900 Euclid Avenue | ) | |
| Adelbert Hall, Room 311 | ) | |
| Cleveland, Ohio 44106 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | **Jury Demand Endorsed Herein** |
| | ) | |

Plaintiff Justin Buchler ("***Dr. Buchler***"), by and through counsel, and for his Complaint against Defendant Case Western Reserve University ("***CWRU***"), states the following:

## **INTRODUCTION**

1.      This is an action to remedy the violations of the rights of Dr. Buchler by CWRU under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*., and under Ohio state law, Ohio Revised Code 4112.02.

2.      Dr. Buchler brings this action to obtain relief due to CWRU's discrimination against him on the basis of sex and disability, and its retaliation against Dr. Buchler for engaging in protected activities.

3.      CWRU's actions and omissions have directly resulted in Dr. Buchler suffering loss of income, and physical and mental pain and anguish.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Additionally, this Court has supplemental jurisdiction over the Ohio state law claims pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (2).

## PARTIES

6.      Dr. Buchler is an individual residing in Cuyahoga County, Ohio.

7.      CWRU is a private educational institution located in Cuyahoga County, Ohio.

8.      CWRU qualifies as an "employer" within the meaning of 42 U.S.C. § 2000e(b), Title VII of the Civil Rights Act of 1964 ("***Title VII***") and 42 U.S.C. § 12111(5)(A), the Americans with Disabilities Act of 1990, as amended ("***ADA***"). CWRU further meets the definition of "employer" in R.C. 4112.01(A)(2).

## BACKGROUND FACTS

9.      CWRU is a private research university that has been in existence since 1967.

10.      CWRU employs approximately 3,501 full time academic staff.

11.     CWRU hired Dr. Buchler on August 1, 2005 as an Assistant Professor in the Political Science Department.

12.     Dr. Buchler has since been elevated to an Associate Professor in the Political Science Department.

13.     CWRU awarded Dr. Buchler tenure in 2011.

14.     Dr. Buchler is an accomplished scholar: Dr. Buchler has solo-authored several books, published multiple articles in the economics-political science journal Public Choice, and received the Gordon Tullock Prize.

## Dr. Buchler's Medical Condition

15.     Dr. Buchler suffers from the medical condition of spondylolisthesis.

16.     Dr. Buchler's spondylolisthesis is a result of his L5 vertebra slipping forward over his S1 vertebra.

17.     Dr. Buchler's medical condition causes him chronic pain.

18.     To ease his pain, Dr. Buchler must partake in a physical therapy regimen consisting primarily of swimming, as well as prescribed stretches.

19.     Dr. Buchler's ability to follow his physical therapy regimen is constrained by his teaching schedule, as well as the times of CWRU's "open swim" hours.

## CWRU and Dr. Beckwith's Discriminatory Actions

20.     CWRU appointed Dr. Karen Beckwith ("**_Dr. Beckwith_**") as the Chair of CWRU's Political Science Department in the Summer of 2015.

21.     Upon Dr. Beckwith's appointment as Chair, she scheduled Department meetings without consulting any Department faculty.

22.     Dr. Beckwith scheduled the meetings for a time that conflicted with the only time Dr. Buchler could reasonably take advantage of CWRU's open swim hours.

23.     Dr. Buchler requested via email that Dr. Beckwith change the meeting times to accommodate Dr. Buchler, so that he may both partake in his physical therapy regimen and attend the Department meetings.

24.     Dr. Buchler's ability to attend the meetings is particularly important given that the Political Science Department is composed of only seven full-time, tenured members.

25.     Dr. Beckwith refused to accommodate Dr. Buchler.

26.     Dr. Beckwith improperly instructed that Dr. Buchler divulge his private medical condition to the entire Political Science Department for the sake of "transparency."

27.     Dr. Beckwith subsequently denied Dr. Buchler's accommodation request in the interests of her own schedule.

28.     Dr. Beckwith suggested that Dr. Buchler skip the meetings so he could attend the open swim hours.

29.     Dr. Beckwith's proposed solution was simply not an option given the intimate size of the Political Science Department and Dr. Buchler's right and need to have a voice at such meetings.

30.     When Dr. Buchler expressed in an email that Dr. Beckwith told him to skip meetings, Dr. Beckwith called Dr. Buchler into her office and told him to retract the email in an act of intimidation.

31.     Dr. Beckwith's unilateral and baseless refusal to accommodate Dr. Buchler resulted in him experiencing significant pain each day he was forced to balance his physical therapy regimen with Political Science Department meetings.

32.     However, Dr. Beckwith's unjust and bad-faith actions against Dr. Buchler were only the start of the wrongs Dr. Buchler has suffered at the hands of CWRU.

### The Republican National Convention

33.     In the Summer of 2016, the Republican National Convention (the "***Convention***") came to Cleveland, Ohio.

34.     Brittany Williams, a former student of the Political Science Department, was a member of the Cleveland 2016 Host Committee.

35.     Ms. Williams acquired a set of passes to the Convention and offered them to the Political Science Department.

36.     Dr. Buchler hoped to attend the Convention in order to conduct a research project.

37.     Dr. Buchler had put a great deal of work into preparing his research project, and prior to the Convention had already received the necessary approval from the Institutional Review Board ("***IRB***") as required for studies involving human subjects.

38.    Dr. Buchler's medical condition meant that his research project was only possible if he had access to the passes, which would provide him with a centralized location from which to conduct his interviews.

39.    Without the passes, Dr. Buchler would be forced to engage in constant movement to find research subjects around Cleveland, which would cause him considerable pain.

40.    Without the passes, the pain Dr. Buchler would suffer would make conducting his research impossible.

41.    However, Dr. Beckwith also wanted to conduct a research project at the Convention.

42.    Dr. Beckwith subsequently claimed all the Convention passes for herself.

43.    Dr. Buchler was forced to abandon his research project.

44.    Dr. Beckwith claimed that she wanted the passes for students because she was teaching a summer course and wanted students to experience the Convention.

45.    Dr. Beckwith further claimed that she never used the passes for herself.

46.    Dr. Beckwith's claims were blatantly inaccurate.

47.    In reality, Dr. Beckwith seized the passes so that she could conduct a survey of Ohio delegates to the Convention with the aid of her summer students.

48.     Given that her study involved human subjects, Dr. Beckwith was similarly required to acquire IRB approval.

49.     Upon information and belief, Dr. Beckwith failed to apply for or otherwise obtain approval from CWRU's IRB, an unmistakable ethical violation.

50.     Dr. Beckwith has denied that any such survey took place, a claim manifestly against the weight of the evidence.

51.     CWRU's own daily campus news platform The Daily posted an article on June 30, 2016 that described CWRU's attendance at the Convention and the survey.

52.     During the Convention, Dr. Buchler further received a call from a Convention attendee, David Montero ("**Mr. Montero**").

53.     Mr. Montero stated that he was with Dr. Beckwith at the Convention and that Dr. Beckwith had provided Mr. Montero with Dr. Buchler's personal telephone number.

54.     Dr. Buchler reported the unapproved and illegitimate study to CWRU, and specifically to associate (now senior) counsel Michelle Arendt, Esq. ("**Ms. Arendt**") and Dean Cyrus Taylor ("**Dean Taylor**").

55.     Ms. Arendt and Dean Taylor had no knowledge of the survey at the time Dr. Buchler reported it to them.

56.     Upon information and belief, Ms. Arendt contacted the IRB to verify Dr. Buchler's statements.

57.     Upon information and belief, the IRB informed Ms. Arendt that no paperwork for such a study existed, from which Ms. Arendt concluded that no study had been conducted.

58.     Ms. Arendt's conclusion was against the weight of considerable evidence to the contrary.

59.     Due to Dr. Buchler's efforts to bring the truth about the study to CWRU's attention, Dr. Beckwith began to take significant retaliatory steps against Dr. Buchler.

60.     Dr. Beckwith strived to make the Political Science Department an unpleasant and harsh working environment for Dr. Buchler.

61.     Among other things, Dr. Beckwith has attempted to restrict Dr. Buchler's teaching schedule so that his course enrollments are limited, and then subsequently write negative reports about Dr. Buchler's low course enrollment.

62.     Dr. Beckwith has berated and humiliated Dr. Buchler during Department meetings.

63.     Dr. Beckwith's actions are especially personal given that the Department and its meetings are small and Dr. Buchler makes a sacrifice for his health to be present at the meetings.

**Dr. Buchler's Attempts to Resolve the Conflicts**

64.     CWRU's inattention and apathy have forced Dr. Buchler to file a series of internal complaints.

65.     Dr. Buchler has filed multiple complaints against Dr. Beckwith.

66.     Dr. Buchler also filed a complaint against former Deputy Provost and Vice President for Academic Affairs Lynn Singer, who has refused to take appropriate steps in response to Dr. Beckwith's actions.

67.     CWRU failed to initiate proper investigations into Dr. Buchler's claims.

68.     CWRU's continued inaction forced Dr. Buchler to file a charge with the Equal Employment Opportunity Commission ("***EEOC***") on August 7, 2017 (EEOC Charge No. 532-2017-01402).

69.     In his EEOC charge, Dr. Buchler alleged claims of disability discrimination and retaliation.

70.     Dr. Buchler attempted to informally resolve his grievances with CWRU, and the parties began informal negotiations on or around May 28, 2018.

### The Proposed Departmental Transfer

71.     Dr. Buchler, his counsel, Ms. Arendt, and Dean Taylor met on May 29, 2018.

72.     During the May 29, 2018 meeting, CWRU, and specifically Ms. Arendt, proposed that Dr. Buchler transfer departments.

73.     Dr. Buchler was amenable to a transfer to the Economics Department.

74.     Dr. Buchler was open to such a transfer because his work in the political science field overlaps heavily with economics.

75.     Specifically, Dr. Buchler is a learned scholar of "game theory," a subset of economics that Dr. Buchler merely applies to questions of political science.

76.     Dr. Buchler also has experience in "econometrics," a subfield of statistics used in economics, having studied econometrics in graduate school at the University of California, Berkley.

77.     Dr. Buchler was qualified to be a professor in the Economics Department.

78.     In the Political Science Department, Dr. Buchler was earning $82,299 annually.

79.     However, upon information and belief, the average salary for an Associate Professor of Economics is $128,600.

80.     Dr. Buchler could earn approximately $46,301 more annually if he were granted the transfer proposed to him.

81.     Importantly, a department transfer would also free Dr. Buchler from Dr. Beckwith's constant ridicule, intimidation, and humiliation.

82.     Ms. Arendt sent Dr. Buchler a letter on August 28, 2018 that stated Dean Taylor would be the liaison with the Economics Department regarding Dr. Buchler's transfer.

83.     However, on October 4, 2018, Ms. Arendt stated that there had been no discussion with the Economics Department regarding Dr. Buchler's transfer.

84.     On October 29, 2018, Dr. Buchler emailed Dean Taylor and included copies of all documents that Dr. Buchler anticipated the Economics Department would need to consider and accept the transfer proposed by CWRU.

85.     Dean Taylor never replied to Dr. Buchler.

86.     No one at the Economics Department ever contacted Dr. Buchler.

87.     Instead, Dr. Buchler's transfer, proposed by CWRU in resolution of Dr. Buchler's claims, was denied without reason on November 15, 2018.

88.     Dr. Buchler is aware of at least four other distinct instances in which CWRU accepted or formally offered a departmental transfer.

89.     Specifically, Dr. Buchler has knowledge that Associate Professor Eileen Anderson-Fye successfully transferred from the Anthropology Department to the Medical School.

90.     Dr. Buchler has knowledge that Professor Jenifer Neils successfully transferred from the Art History Department to the Classics Department.

91.     Dr. Buchler has knowledge that Professor Kathryn Lavelle was formally offered a transfer from the Political Science Department to the Medical School.

92.     CWRU treated Dr. Buchler differently from similarly situated female colleagues, none of whom, upon information and belief, has a disability.

93.     Dr. Buchler further has knowledge of that Professor John Orlock, a male faculty member without a disability, also successfully transferred.

94.     CWRU's allowance of the above transfers while denying Dr. Buchler's constitutes disparate treatment.

95.     Dr. Buchler further has knowledge that CWRU filled a position in the Political Science Department by hiring Girma Parris.

96.     Joshua Yesnowitz had applied for the same position, but was passed over in favor of Mr. Parris.

97.     Mr. Parris is an African-American male, while Mr. Yesnowitz is a Caucasian male.

98.     Mr. Yesnowtiz was qualified for the position, but, upon information and belief, CWRU opted to hire Mr. Parris because of his status as an African American male.

99.     Dr. Buchler has been denied a transfer, despite his qualifications, while CWRU has permitted the transfer or hire of other similarly qualified individuals because they were African-American, female, and/or not disabled.

100.    Dr. Buchler has reported the above incidents, but, upon information and belief, CWRU has taken no action.

101.    Dr. Buchler has suffered because he lost the ability to earn a higher salary in the Economics Department.

102.    Dr. Buchler is further suffering because he remains subject to Dr. Beckwith's control and effective crusade against him while CWRU turns a blind eye.

103.    Dr. Buchler has been subject to additional retaliatory actions.

### CRWU's Other Bad-Faith Actions

104.    CWRU has made various complaints and findings against Dr. Buchler.

105.    Specifically, James Ryan ("***Mr. Ryan***") from the CWRU Benefits Office reported that Dr. Buchler had used inappropriate language in an email.

106.    The CWRU Faculty Handbook guarantees a hearing following any alleged violation of the Handbook.

107.    CWRU failed to inform Dr. Buchler of the charge against him until after CWRU held a hearing and found Dr. Buchler responsible.

108.    The allegation of inappropriate language was untrue, and Dr. Buchler would have proven as much if he had been given an opportunity to defend himself.

109.    CWRU violated its own policies in failing to inform Dr. Buchler of either the charge against him or the hearing until it was too late for Dr. Buchler to defend himself.

110.    Dr. Buchler learned of the finding against him when Dean Taylor personally apologized to Dr. Buchler for the letter of censure Dr. Buchler was to receive regarding the alleged violation.

111.    Additionally, CWRU has asserted a claim against Dr. Buchler for alleged "cultural insensitivity" towards a student.

112.    Upon information and belief, CWRU's only evidence of such cultural insensitivity is a letter drafted by a relative of the student.

113.    CWRU failed to inform Dr. Buchler of either the letter or the claim for over a year.

114.    Dr. Buchler only became aware of the letter when Gabrielle Lincoff, Esq.'s ("***Ms. Lincoff***"), of the CWRU Office of General Counsel, included it in CWRU's statement in response to Dr. Buchler's 2017 EEOC filing.

115.    To date, CWRU still has failed to provide Dr. Buchler with a copy of the letter.

116.    CWRU has also failed to provide Dr. Buchler with an opportunity to respond to the letter's contents or otherwise defend against the claim.

117.    CWRU raised and supported unfounded complaints against Dr. Buchler in retaliation for his filing of internal complaints and EEOC charges.

118.    Dr. Buchler filed a second charge with the EEOC on January 28, 2019.

119.    Dr. Buchler alleged claims of sex discrimination and retaliation in violation of Title VII, and disability discrimination and retaliation in violation of the ADA.

120.    Dr. Buchler received his Dismissal and Notice of Right to Sue Letter on November 12, 2019, granting him 90 days to file suit in federal court.

121.    This suit has been timely filed within the 90-day deadline.

## COUNT I
## Violation under Title VII and R.C. 4112.02(A) – Sex Discrimination

122.    The previous paragraphs are incorporated herein by reference.

123.     Dr. Buchler is male.

124.    Dr. Buchler is qualified to be a professor in the Political Science Department.

125.    Dr. Buchler is similarly qualified to be a professor in the Economics Department.

126.   CWRU treated Dr. Buchler differently from similarly situated female colleagues in denying his department transfer when it had previously approved or formally offered at least three female colleagues a department transfer.

127.   CWRU denied Dr. Buchler's transfer on the basis of sex.

128.   CWRU denied Dr. Buchler's transfer despite the fact that CWRU proposed the transfer.

129.   Dr. Buchler has suffered damages in the form of lower pay, limited course enrollments, constant ridicule and embarrassment in Political Science Department meetings, and being subjected to unnecessary and avoidable pain in order to balance his physical therapy regimen and Department obligations.

130.   CWRU's actions have adversely affected the terms, conditions, and privileges of Dr. Buchler's employment with CWRU.

131.   CWRU's actions have adversely affected Dr. Buchler's ability to perform his employment duties.

132.   Dr. Buchler made multiple internal complaints to numerous persons at CWRU, and CWRU knew or should have known of its improper conduct.

133.   Despite its knowledge, CWRU failed to take prompt and corrective action to end the discriminatory conduct.

134.   Dr. Buchler suffered intentional discrimination at the hands of CWRU and its employees/agents, based on his gender, in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a)(1). CWRU further violated R.C. 4112.02(A) by

discriminating against Dr. Buchler with respect to the conditions and privileges of his employment on the basis of sex.

135.    As a direct and proximate result of CWRU's actions and omissions, Dr. Buchler is being deprived of at least $46,301 annually.

136.    As a 43-year-old man, Dr. Buchler would be able to work in the Economics Department for decades.

137.    Were Dr. Buchler to retire at the age of 65 with no further salary adjustments, Dr. Buchler would earn at least an additional $1,018,622.00 over the course of his employment.

138.    As a further direct and proximate result of CWRU's actions, Dr. Buchler has been subjected to humiliation, emotional distress, pain and suffering, inconvenience, mental anguish and other related compensatory damages.

139.    CWRU failed to make good faith efforts to prevent the illegal discrimination against Dr. Buchler.

140.    By failing to take prompt and effective remedial action, CWRU condoned, ratified, and authorized the discrimination against Dr. Buchler.

141.    As demonstrated above, CWRU engaged in such discriminatory practices with malice and reckless indifference to the federally protected rights of Dr. Buchler.

142.    Dr. Buchler is therefore entitled to an award of punitive damages in an amount sufficient to punish and deter CWRU and other employers from like conduct in the future.

143.    Dr. Buchler is also entitled to recover reasonable attorney's fees, as provided in Section 706(k) of Title VII, 42 U.S.C. §2000e-5(k).

### COUNT II
### Violation under Title VII and R.C. 4112.02(I) – Retaliation

144.    The preceding paragraphs are incorporated herein by reference.

145.    At all times when Dr. Buchler opposed the discriminatory conduct against him by filing internal complaints and EEOC charges, Dr. Buchler was satisfactorily performing his employment duties.

146.    Dr. Buchler's filing of internal complaints and EEOC charges regarding CWRU's discriminatory conduct was protected conduct under Title VII and R.C. 4112.02(I).

147.    Dr. Buchler suffered materially adverse employment actions by CWRU in retaliation for filing internal complaints and EEOC charges against CWRU.

148.    CWRU subjected Dr. Buchler to materially adverse employment actions in the form of denying his department transfer regardless of his qualifications, forcing him to remain in a department where he is subjected to ridicule and embarrassment, and interfering with his ability to receive better pay.

149.    CWRU further subjected Dr. Buchler to materially adverse employment actions by denying his transfer after he reported his belief that Mr. Parris was hired instead of Mr. Yesnowitz due to Mr. Parris's status as an African-American.

150.    CWRU's adverse actions were improper and in direct retaliation for Dr. Buchler's engagement in protected conduct.

{K0767924.6}                                    17

151.    CWRU's retaliatory actions were such that a reasonable employee would have found the challenged actions materially adverse.

152.    CWRU's retaliatory actions were such that a reasonable employee would have been dissuaded from making or supporting a charge of discrimination.

153.    Dr. Buchler suffered intentional discrimination and retaliation at the hands of CWRU and its employees/agents based on his gender, in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e, *et seq.* CWRU further violated R.C. 4112.02(I) for discriminating against Dr. Buchler for his opposition to CWRU's unlawful discriminatory practices.

154.    As a direct and proximate result of CWRU's actions and omissions, Dr. Buchler has been denied additional income, as well as other monetary and non-monetary benefits.

155.    As a further direct and proximate result of CWRU's actions and omissions, Dr. Buchler has been subjected to humiliation, emotional distress, pain and suffering, inconvenience, mental anguish and related compensatory damages.

156.    As demonstrated above, CWRU engaged in such discriminatory practices with malice and reckless indifference to the federally protected rights of Dr. Buchler.

157.    Dr. Buchler is therefore entitled to an award of punitive damages in an amount sufficient to punish and deter CWRU and other employers from like conduct in the future.

158.    Dr. Buchler is also entitled to recover reasonable attorney's fees, as provided in Section 706(k) of Title VII, 42 U.S.C. §2000e-5(k).

## COUNT III
### Violation under Title I of the ADA and R.C. 4112.02(A) – Disability Discrimination

159.    The preceding paragraphs are incorporated herein by reference.

160.    This claim is authorized and instituted pursuant to Section 102 and 107(a) of the ADA, 42 U.S.C. § 12117(a), which incorporates by reference Section 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3) and pursuant to Section 201 of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a). This claim is further instituted pursuant to R.C. 4112.02(A).

161.    Dr. Buchler suffers from spondylolisthesis, which substantially limits major life activities.

162.    Dr. Buchler is a qualified individual with a disability under Section 3 and 101(8) of the ADA, 42 U.S.C. §§ 12102 and 12111(8), as amended by the ADA Amendments Act of 2008. Dr. Buchler's medical condition further meets the definition of "disability" at R.C. 4112.01(A)(13).

163.    CWRU has engaged in unlawful employment practices in violation of Title I of the ADA and R.C. 4112.02(A).

164.    CWRU's violations include denying Dr. Buchler research opportunities, effectively forcing him to forego his physical therapy regimen, or suffer additional pain to attend necessary meetings, because of his disability.

165.    CWRU further denied Dr. Buchler a department transfer, despite his qualifications, while it approved the transfer of other faculty members who did not have a disability.

166.    Dr. Buchler requested reasonable accommodations from CWRU and its employees/agents for his disability.

167.     CWRU denied Dr. Buchler's requests for accommodation without adequate justification.

168.    CWRU's actions have deprived Dr. Buchler of equal employment opportunities and have adversely affected his status as an employee and professor, because of his disability.

169.    The unlawful employment practices described in the preceding paragraphs are intentional.

170.    The unlawful employment practices described in the preceding paragraphs were done with malice or with reckless indifference to the federally protected rights of Dr. Buchler.

171.    Dr. Buchler is therefore entitled to receive those compensatory and punitive damages that this Court deems to be proper.

172.    Dr. Buchler is also entitled to recover reasonable attorney's fees, as provided in 42 U.S.C. § 12205.

## COUNT IV
### Violation of the ADA (42 U.S.C. § 12203) and R.C. 4112.02(I) – Retaliation

173.  The preceding paragraphs are incorporated herein by reference.

174.   Dr. Buchler's filing of internal complaints and EEOC charges describing CWRU's discriminatory actions was protected conduct under the ADA, 42 U.S.C. § 12203(a). Those same acts qualify as Dr. Buchler opposing CWRU's discriminatory practices pursuant to R.C. 4112.02(I).

175.   CWRU violated the same when it discriminated against Dr. Buchler for his engagement in protected activity.

176.   CWRU retaliated against Dr. Buchler for his engagement in protected activities when it approved the transfer or hire of other similar qualified individuals who did not have a disability.

177.   CWRU further retaliated against Dr. Buchler after he expressed in an email that Dr. Beckwith told him to skip department meetings to address his physical therapy needs, when he was called into Dr. Beckwith's office and told to retract the email in an act of intimidation.

178.   CWRU's adverse actions were improper and in direct retaliation for Dr. Buchler's engagement in protected conduct.

179.   CWRU's retaliatory actions were such that a reasonable employee would have found the challenged actions materially adverse.

180.   CWRU's retaliatory actions were such that a reasonable employee would have been dissuaded from making or supporting a charge of discrimination.

181.   Dr. Buchler suffered intentional discrimination and retaliation at the hands of CWRU and its employees/agents based on his disability, in violation of the ADA.

182.  As a direct and proximate result of CWRU's actions and omissions, Dr. Buchler has been denied additional income, as well as other monetary and non-monetary benefits.

183.  As a further direct and proximate result of CWRU's actions and omissions, Dr. Buchler has been subjected to humiliation, emotional distress, pain and suffering, inconvenience, mental anguish and related compensatory damages.

184.  As demonstrated above, CWRU engaged in such discriminatory practices with malice and reckless indifference to the federally protected rights of Dr. Buchler.

185.  Dr. Buchler is therefore entitled to an award of punitive damages in an amount sufficient to punish and deter CWRU and other employers from like conduct in the future.

186.  Dr. Buchler is also entitled to recover reasonable attorney's fees, as provided in 42 U.S.C. § 12205.

**WHEREFORE**, Dr. Buchler prays for judgment and relief as follows:

(a)  As to Count I, compensatory and punitive damages, including loss of income in an amount in excess of $1 million, or as this Court finds reasonable, and attorney's fees;

(b)  As to Count II, compensatory and punitive damages, and attorney's fees;

(c)  As to Count III, compensatory and punitive damages, and attorney's fees;

(d)  As to Count IV, compensatory and punitive damages, and attorney's fees;

(e)     Award Dr. Buchler all of its costs and expenses associated with this
        action, including attorney's fees and other court costs; and

(f)     Award all such other relief as this Court may deem just and proper.


## **JURY DEMAND**

Dr. Buchler hereby requests a trial by jury on all counts and allegations of

wrongful conduct alleged in this complaint.


                            */s/ Robert S. Gilmore*
                            ROBERT S. GILMORE (0037042)




                            Respectfully submitted,

                            */s/ Robert S. Gilmore*
                            ROBERT S. GILMORE (0037042)
                            JUSTINE LARA KONICKI (0086277)
                            One Cleveland Center, 29th Floor
                            1375 East Ninth Street
                            Cleveland, Ohio 44114-1793
                            Telephone: (216) 696-8700
                            Facsimile: (216) 621-6536
                            Email: rsg@kjk.com; jlk@kjk.com

                            ***Counsel for Plaintiff***